Mr. Trachman and Ms. Nelson, I think, are representing the appellees, so we'll hear first from Mr. Trachman, please. Good morning, Your Honors, and may it please the Court, William E. Trachman for Appellant Josh Young, who is here with me on the Court today. I'm going to try to reserve three minutes for rebuttal. After Justice Jackson's decision and the Ames decision last year, we know that Title VII and Title VIII, and 42 U.S.C. 1981, apply equally to Mr. Young as a Caucasian person as they would apply to an African American employee, an Hispanic employee, a female employee, or a gay employee. In other words, the fact that the training at issue here is called DEI or EDI training does not alter this Court's inquiry. Can I ask you, and I'm sorry to interrupt so early, but about the impact of Ames. Now, Ames was a zero-sum game. There's two people applying for a job, a female homosexual, a heterosexual. One of those individuals is going to get the job, and the disposition was just as you identified it in your brief. Does that apply equally to a hostile work environment? You know, for example, if you were to take this set of facts and say this panel is sitting not only in 2000, not in 2026, but in 1960 or in 1860 on the heels of a civil liberties movement where there was great discrimination and interference with educational opportunities for, you know, blacks, or to take an even greater example or a more extreme example, the Reconstruction era in the aftermath of the Civil War, would you still say that it was, that we have to be completely agnostic, treat racial majorities and minorities equally as we did in, as the Supreme Court did in Ames where you have two people applying for a job and saying that favoritism based on sexual preference is, you know, an improper consideration? Does that mean that we are completely insulated from our history and that we can't consider the fact that there have been educational impediments to minorities? Well, 100% yes, Your Honor, on the first part of your question, which is you are agnostic as to the race of the plaintiff. That's Ames. Now, Ames is at heart a textualist decision about what Title VII means, and it says that judges can't treat plaintiffs differently for a Title VII inquiry based on the race of the party who comes before them, and I think that 100% applies to a hostile work environment claim. Now, there are other cases, I think on Colley as cited by the District Court, that say you can take historical circumstances into account sometimes to decide how offensive something is, and I think that's a little bit of a different inquiry, and maybe that's the second part of your question, but we would say that the Court shouldn't do that at the motion to dismiss stage. Mr. Young has pled over and over again how the training itself was offensive to him and to any Caucasian person, and then also how that affected the workplace in a way that was toxic that created safety risks, and so to answer your question directly, you are agnostic as to Mr. Young's race. You can look at the four corners of the complaint and say, okay, this survives the motion to dismiss. Maybe at the motion for summary judgment stage or at the trial stage, the state can say, look, it's not really offensive if you use the full N-word. If you're talking about a white person thinking about black people as the N-word, that's different, but we think that's a question for a jury, not a court on the motion to dismiss stage. Thank you. So under Young 1, we acknowledge that it's not enough for a plaintiff to state a hostile environment claim, even if an employer has virulently racist training materials, including even the full use of the N-word in the training materials. That's the ground as we take it under Young 1. So the question is, what more is needed to state a claim to survive a 12B6 motion? In Young 1, the court said that a single training isn't enough, but perhaps an ongoing commitment would be enough. It also said that while the training – Well, did Judge Timkovich say an ongoing commitment, or did he say that if there was a repetition of the offensive EDI training? In other words, if he said – and you may be right, but I don't remember Judge Timkovich saying that, well, if they said that EDI – this EDI training was problematic, and he certainly indicated that, but I don't recall anything saying, well, if the plaintiff had alleged that they were going to repeat EDI training in the future, that that would itself inherently mean that now there is a hostile work environment. In fact, arguably, he said the opposite when Mr. Young alleged that he was going to be jeopardizing safety by second-guessing his own decisions when they would be subject to second-guessing based on racial antagonism, and he called that speculative. Well, just to be clear, Your Honor, we view Young 1 as laying out four independent markers for how you can supplement the mere allegations relating to the training materials. This is one of them. I do think that the decision says perhaps an ongoing commitment. Maybe one of us is wrong, but the idea is that if you have an employer who says, I'm going to teach you racist concepts today, and you can count on the fact that they're going to be repeated in the future, you don't have to wait for the annual training to reoccur. The second marker is that even if the training itself talks about your deficiencies and your inadequacies based on your race, that's not enough. But if the employee is required to endorse such viewpoints, that could change the inquiry. The third is that if an employee is able to show that the training was acted upon within the workplace, that might be enough. And fourth, if there is a safety issue within the workplace, that itself might be enough. So with respect to the first inquiry, absolutely we do think there's an ongoing commitment here. Your Honor. I'm questioning the ongoing commitment aspect of it, too. My understanding was they talked about ongoing training and a certainty of ongoing training. I don't think you have anything here beyond a single training, a single online training. Well, respectfully, Your Honor, we do have a single online training, but then we have a complete paradigm shift within the prison saying you are going to have to integrate this training in your day-to-day routine decision-making. That's part of the modules that says you don't need to wait for any more instructions. This is part of your job. Again, it's a single online training. In terms of the severity of that event, I guess is what I'm looking at right now. I mean, you've got to show either severity or... Pervasiveness. Right. Pervasiveness. You've got to have one or the other. And I guess I would ask you what do you have to show in terms of severity, if anything? Kandor, Your Honor, we view young one as cutting off severity. Okay. We're talking about pervasiveness here. I appreciate that. We have preserved for further appellate review. Okay. So pervasiveness, if you have a single event, and even if you have a commitment, even if you have a commitment to maybe some ongoing training that's not planned and hasn't happened, what do you still have in terms of pervasiveness with respect to training? Well, again, this training was meant to be a paradigm shift, so it involves the bystander intervention process where if a non-Caucasian person is interrupted, the employees have to stop and say, hold on, we need to make a correction here. The conversation can't continue. It involves meetings policies where women and non-whites have to speak first at meetings, where that has to happen, that discussion has to happen before the meeting starts. This was all in the training. This is what the training requires in day-to-day. Yes. In terms of his own experience, though, in the workplace as far as pervasiveness, what events or instances of harassment have you pointed to in terms of his own experience? Right, right. That could be looked at objectively, not subjectively, as to how he was feeling or what he thought this might all mean to him.  Objectively. So we lay out nine instances where this training affected the workplace. So performance reviews were immediately changed. But I'm asking about his own experience. So Mr. Not just generally. What was his experience in the workplace? Did he, did his performance review somehow decline or was it impacted in some negative way that objectively would have been something he could consider harassment? The performance review is not in the record. I apologize, Your Honor. The performance review is not in the record. We don't have that from the state yet. But we do have Josh Young's, his job, suffering. He was having a hard time keeping contraband out of the prison. He himself. I don't think he said he had a hard time keeping contraband out of the prison. I think he did not give a single instance where he did not think he kept it out of the prison. He talked about his subjective feeling about being concerned when he was, I guess, processing people who were entering the prison. But he didn't talk about there being any instance where he said I, he, or that anyone objectively observed that. It was just a feeling that he had that he was concerned, apparently. He wanted to make sure he didn't do anything he shouldn't be doing. The complaint says it made his job of keeping contraband out of the prison harder because he was constantly paranoid that people were going to say, why are you searching this person? They're a black person. You know from the equity continuum that you have to treat this person differently based on your workplace training. Okay. So subjectively he felt that way. Is there anything objective there that anyone could have observed or that someone said something to him that made him feel that way? Well, his friend, Mr. Gillis, said that his job was also getting harder because he couldn't prepare prisoners for release adequately. That's paragraph 3. I'm trying to focus in on the plaintiff here. Okay. He saw innocent remarks in the prison getting challenged as contradicting the training itself. And the fact that he needed to use force. Any of those remarks made to him? No, we don't plead that he was insulted or ridiculed. He wasn't involved in any of those. Right. He just, his observations. Right, but the test is not insult or ridicule in a vacuum. It's also intimidation, and it also relates to the terms and conditions of your employment. So you don't have to actually suffer a secondary insult based on the training from one of your colleagues. So we've identified those. And, again, Young himself, I realize that there are some allegations, sorry, some description in the district court opinion about how these were subjective. But we view these as objective. The fact that Mr. Young had a more difficult time keeping contraband out of the prison is an objective factor that came from the fact that he was interacting with people of all different races and was told from the training, you need to treat people differently based on their race. Second, if the training weren't actually affecting the workplace in a widespread way, why would he file his complaint? So he filed his complaint in July of 2021. The prison system summarily dismissed it without any investigation. They said, we're not even going to investigate the allegations you've made that this training is creating an unsafe working condition. We do cite several cases talking about the failure of an employer to even investigate an allegation of hostile work environment. We think those are not responded to at all by the defense. And we would say that, absolutely, this is notice pleading. We have survived a motion to dismiss. Maybe at the end of the day these allegations won't survive a motion for summary judgment. But for getting over a 12B6 motion, we have adequately pled not just the training, but also the effect on the workplace. With that, I'll reserve the remainder of my time for rebuttal. Thank you very much. Thank you. Good morning, and may it please the court. My name is Pavan Nelson, and I represent the police. This is a straightforward case. In order to bring a hostile work environment claim, a plaintiff must plausibly allege that their workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of that person's employment from both a subjective and an objective standpoint. What if the training said white people are inferior to black people, or to Hispanic people, whatever. Pick your pejorative poison. And they say, as the amended complaint says, that that training is going to be factored into your evaluations. And then they say, as the complaint does, that the EDI training will be repeated every year. Now, this is unlike a lot of hostile work environment cases where there are individual employees who make very insulting pejorative remarks. This is more like, let's say, an analogy of a civil rights case of a Monell claim. This is a policy. This is how we are going to train every single supervisor, guard, correctional officer. And so in that case, liberally construing the complaint, why wouldn't the official adoption of this policy that is going to be factored into not only your training, but your raises, your bonuses, your evaluations, why wouldn't that survive the very low standard under 12b-6? Well, Your Honor, I think the court said it best in Young 1. As the court explained in Young 1, simply characterizing something as an official policy is not necessarily sufficient to bring a hostile work environment claim. There needs to be a demonstration, well-pleaded facts, that there is racial animus manifesting itself in the day-to-day working environment. And not only racial animus, in order to beat the high bar for a hostile work environment claim, there needs to be a steady barrage of appropriate racial comments. The court explained that in Young 1. This has been a well-established standard in the hostile work environment context for decades. And so, again, the comments you said, problematic, obviously, but stray comments are not enough to meet that high bar. Well, that's, and I don't mean to belabor this, but can I drill down on stray comments and whether or not that sort of gets at the nub of what I'm struggling with. Is this a stray comment, or is this the official implementation of arguably improper policy? For example, let's assume that I am a religious minority. Let's say, hypothetically, I happen to be Jewish. I am Jewish. So I apply as a guard, and the training says, pick your pejorative epithet about Jewish people. And it says, this is the training. This is going to be factored into your evaluations, and this is going to be factored into your quarterly performance reviews, as the complaint says. This is going to be repeated in the future. Is it fair under 12b-6 with liberal construction of complaints to say, well, that was just a stray comment. That was just some line in a training policy. Or is it something more, qualitatively more severe? Is it, this is how you are to understand your job. This is how your supervisors are to understand your job. This is going to affect your livelihood. This is going to affect your evaluations, your ability to avoid termination, suspension. This is going to affect your bonuses. Can we really derogate this and say, well, this is just, you know, the equivalent of somebody saying an improper epithet about Jewish people? I think you can, Your Honor. I think the standard is pretty well established. And I think the court in Young 1 explained it. It, you know, again, there's an objective standard here for a reason, right? It's a high bar to make a hostile work environment claim. And subjective fears about the future, about what might happen, that's not enough to demonstrate that there was a steady stream of appropriate racial comments, that the workplace was permeated with discrimination. And, you know, and to go into your specific comments, I think if you really drill down and actually look at the allegations in this, in Mr. Young's complaint, that they're conclusory allegations about his subjective beliefs. You're talking about his, you know, the performance reviews. He feared that he would get a negative performance review. Without providing any factual enhancement, he says he was assured that they would be factored in. Are you actually challenging that his subjective fears were certainly reasonable based on what he had learned through the training? I mean, I'm not saying it matters or not, but would you, I mean, are you challenging that, that his subjective fears are reasonable? I'm kind of trying to play out this line between subjective and objective, too, when you actually have something that you can see and feel and look to, which is this training, which has some objectionable matter in it. That's something we can all look to as a reasonable person. What do we think about that and how a person would react to that? But then we're basically looking now at his reactions to it as subjective, his subjective behaviors, subjective views, and maybe that's not fair to do that when it's pursuant to the company's policy that he has these fears. So no, Your Honor. I'm not challenging that Mr. Young has pled that he had, you know, subjective, you know, subjectively that he felt that the, you know, that his environment was hostile. I'm certainly not challenging that. He's pled that. I think our point is that's not enough to sustain the claim. As the court explained in Young 1 and as the district court found, there needs to be an effect on the workplace, racial animus manifesting itself in the day-to-day working environment due to the training in order to sustain the claim. And that's really what I'm focused on, that there's really no well-pleaded allegations in his complaint that demonstrate that. And your back and forth with Mr. Truckman when he was up here, I think, demonstrates that. Well, I mean, the plaintiff said he had fears as he was doing, you know, when he was screening people. He didn't want to appear as biased or to be treating anyone differently. And he thought about that. And he didn't necessarily say there was a time when he missed something. But how does he even know that, I think, is the problem. How does he know how this is potentially impacting who he's allowing into the prison? Well, I think there has to be something. How can he show anything there as a result of his fear, other than his fear that he's living with and, in his view, is permeating his workplace? Yeah, I think it is possible, Your Honor. And when you look at other cases in the prison context where there's a hostile work environment that has been radically alleged, they have demonstrated, in addition to these fears, that there was something done in the workplace that affected workplace safety. So in their brief, Mr. Young cites the Dawson case, which is a Second Circuit case in the prison context, where a supervisor circulated obscene and violent letters written by inmates about the female prison guards around the prison. And, again, there was actions by the supervisor to undermine the safety of the female officers. In that instance, the court said, you know, that's enough to demonstrate pervasive harassment. There's another case I think is cited in the district court's order. I think it's Semroth. It wasn't in the prison context, but it was a law enforcement context. In that case, same hostile work environment, female officers, they allege that the co-workers failed to back them up in emergencies, and that was the objective element that demonstrated that there was a safety risk besides their subjective fears. And I think when you contrast those cases with what Mr. Young is alleging here, it's just not the same. It's only just, you know, he was afraid he might be written up based on his interpretation of the training, and there he was hesitant and second-guessed himself sometimes. Not all seems reasonable that he felt that way. But, again, there needs to be, again, I think as the standard is pretty clear, that there is more than just subjective fears. It has to be an objective component as well. So the company can have a policy or the Department of Corrections can have a policy, but it can't be pervasive-type harassment until somebody actually does something or enforces the policy or disciplines someone or calls something to their attention and makes them, you know, objectively feel uncomfortable. And you see what I'm saying? Yes, I see exactly what you're saying, and I think the answer is yes, Your Honor. I think that's what the lesson was in Young 1, and I think that's what the lesson is in cases where they have found that a plaintiff plausibly alleged a hostile work environment claim. And several of these cases have been cited. It was cited in Young 1 and in the District Court of Order. DiPiero, Deamer, Johnson, Mr. Young submitted a supplemental authority, the Chislett case. This is a Second Circuit case where, in that case, multiple EDI trainings, there were allegations that coworkers repeatedly used the comments from the training against the supervisor, the plaintiff. When the plaintiff complained, the plaintiff was demoted, was taken away from supervisory responsibilities, repeated EDI trainings, repeated comments from coworkers, and at the end, after she complained, she was criticized so routinely that she went on short-term disability for emotional distress. Those are examples of adequately pled, inadequately pled hostile work environments claims, and when you compare it to the allegations here, it just simply doesn't match up. It's really conclusory allegations about his objective beliefs, and that really is not enough. Could you respond to the discussion about what our prior opinion said on the training and what might be required? It was dicta, of course, but I did find it in footnote 2, and I think Pelham's counsel did accurately characterize it. It said, perhaps, and that's a big perhaps, obviously, an ongoing continuing commitment from Mr. Young's supervisors to mandatory EDI trainings with content similar to the one here may evolve into a plausible hostile workplace claim. Was there an ongoing continuing commitment from his supervisors to mandatory EDI trainings? No, there's not, Your Honor. I don't think there's any allegations of complaint that a supervisor actually said anything to that effect. It was he expected it to recur. So, again, that's, you know, he believed it, but there's nothing objectively. There's no comment from a supervisor that said that. And just to back up a little bit, Your Honor, you called it dicta, and I think it's important to keep in mind, like, the discussion itself. You know, in the employment discrimination context, there aren't really per se rules like that. If you check this box, you're automatically in, right? I think that's why, well, it's dicta, obviously, but it also started out as perhaps. I agree, Your Honor. And so I think the Twombly-Iqbal standard kind of goes to this. Threadbare recitals of causes of action don't suffice. And I would say here, threadbare recitals of that footnote is not enough to push it over the line. Again, you need to meet the standard, the severe pervasive standard. They need to be a, you know, permeated with discriminatory conduct, racial animus. And none of that is really in the complaint, Your Honor. Assuming, arguendo, that one of us might question whether or not it really is just a conclusory allegation, how do you interpret paragraph 8, he took the training in March 21, soon after it was assigned. Like all other assigned training, the material from the EDI training was expected to be used every day at work. That doesn't seem like a lot of what we day-to-day see as conclusory allegations. Most, it's not terribly, inherently implausible for an employee to say, my boss gives me training every single year, doggone it. Every year, the Colorado Bar Association makes me do this, you know, darn CLE training. You know, it's not necessarily conclusory to say, well, I think the Colorado Bar Association is going to make me take a bunch of CLE next year. And it seems like that's what he's doing in paragraph 8, so it was expected to be used every, you know, the material for the training was expected to be used every day at work. And then he elsewhere alleges that he was assured that the training would happen each year. So, I'll say quickly, Your Honor, I would argue that there's no factual enhancement there. So those are conclusory. But even if you think they're well-pleaded allegations, I think the lesson from young one is, again, there needs to be a tangible impact of racial animus in the day-to-day working environment. And, you know, you look at the training, for example, Mr. Trautman mentioned, you know, meetings, who speaks first in meetings. But there's no allegation that that was actually applied at any meeting Mr. Young actually attended. There's no allegations that any of the aspects of the training that he found objectionable actually showed up in his day-to-day working environment. Doesn't he plead that it did? Isn't there an employee of color who is under some sort of reprimand procedure and then gets relief that Officer Young ties to the training? Is consistent with the training in his view? Respectfully, Your Honor, I don't think that's necessarily a well-pleaded allegation that would support a hostile work environment. Could you speak up just a little bit or closer to the microphone? I apologize. I apologize. Thank you. I don't think that's a well-pleaded allegation that supports a hostile work environment because essentially what he's saying is an unnamed officer at an unknown time successfully challenged some unknown discipline against some unnamed, you know, supervisors that had nothing to do with Mr. Young. And Mr. Young came to the conclusion that the training affected the environment. I think that's conclusory. It doesn't demonstrate that he was being harassed. And I don't think that's enough to support a hostile work environment. I see my time has way elapsed. So unless the Court has any other questions for me, I would respectfully request that the Court affirm the District Court. Thank you. Okay. Thank you very much. I do think the appellant has some rebuttal time. Thank you, Your Honors. I think my friend's argument amounts to the fact that an employer could have official training materials that says, Negroes need to grovel at the feet of Caucasian colleagues starting tomorrow. And the next day that could happen and an employee who is African-American could say, I feel uncomfortable. I shouldn't have to grovel at the feet of my colleagues. And that would still not suffice to create a hostile work environment because no one's calling that person a name. No one is saying your job duties have to change. I'm Jewish. I'll just say if I went to work for an employer who said, every colleague needs to spend their first 15 minutes on the job thinking about a final solution to the Jewish problem, I would think, I would feel uncomfortable if that starts tomorrow. What is the next thing that I have to do? The training under Young One might not be enough, but I really don't think we need to say a lot more has to happen in the workplace before a plaintiff who's subjected to that kind of training material, official policy from the workplace, is able to survive a 12B6 motion. So in Young One, the court said, this training sets the stage for actionable conduct. I mentioned in my initial opening remarks, this was a complete paradigm shift in the prison. They had micro-affirmations. They had bystander interventions. They told you that you needed to incorporate this training in your routine day-to-day decision-making that had to be fully integrated in everything you do. So no surprise, yes, Your Honor, that Mr. Young saw a low-level corrections officer being disciplined jointly by a lieutenant and a sergeant. And then when that corrections officer said, I've been discriminated against based on my race, it was reversed. Mr. Young attributed that to the training. I don't think that's an unreasonable attribution. At least it's enough to survive the 12B6 motion. Let me also talk about a few notes. On ER 748, I think, Your Honor, Judge Moritz, that ongoing commitment language, it does say perhaps, but again, that's one of the four markers that I think the Young One court laid out. It is the ongoing commitment, the employee endorsement, the actual actions by your colleagues, and then also the safety issue. And we've pled all four of those markers. And last, I think on liberal construction of the pleading, I think that Your Honors have embraced that standard and the district court expressly rejected it. Thank you so much. I have a question before you surrender the podium. So I just want to make sure I understand your argument. You're not saying that if the training itself amounts to the adoption of a policy, that that's enough, that you don't need to supplement that theory with specific allegations showing that the policy is implemented in the workplace in a way that changes the working conditions? That's Young One, Your Honor. So we take Young One as we find it. So, yes. Thank you. Can I ask what other questions before you leave? And I think it's a short question. It may or may not be a short answer. But I just had a question about two of the items that Judge Timkovich was troubled by in Young One. One was the redlining video, and the second was the claymation. As I understand it, both of those were in videos that were linked in Module 4. But as you point out in your complaint, I don't mean to point at you, in the complaint, it does specifically acknowledge that on page 7 of the transcript, it specifically says, as the module says over and over again, that these are additional videos that may or may not be pertinent to your day-to-day work here. And none of these videos are either approved or endorsed by the state of Colorado. And so, even with liberal pleading, you have specifically pleaded, as I think you're obligated to do, to acknowledge that the state of Colorado doesn't even endorse or approve any of those videos. So, how can we take those videos even into account when we analyze the case? That's been nagging at me. Thank you, Your Honor. So, respectfully, there were some outside materials where the training disclaims whether it might be relevant. That's not what the recommended trainings were. In Module 4, where they say other recommended trainings and readings, that was a link that was blessed by the state of Colorado. Module 4 was? Right, but the links in Module 4 are ones that say these might enhance your experience, and you should use these in order to gain knowledge about it. There are other materials saying these are just out there, but those are not the links that Your Honor is talking about. You're saying that the redlining and the claimation videos are in videos in Module 4 that said you need to look at these and that these are endorsed by the state of Colorado? So, to be clear, they don't say these are endorsed. They say these are recommended, and then there are other materials that are just linked. And the state of Colorado says you can take a look at these if you want. We don't endorse them. But the redlining video is not one of those. It's not one of the videos where they say take it or leave it. It's specifically in the other recommended. And when Mr. Young filed his complaint and they responded to him, they said the required materials that you are referring to were taken by everybody. I see. Thank you for indulging me. Good. Thank you very much, counsel, for both sides. I think I can speak for the panel when I say that the briefing and the arguments were excellent, and we appreciate your wonderful advocacy in writing it in today. This matter is submitted.